**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

Robert Allen Howell, et al.,                              )     No. 04-CV-2280-PHX-FJM
                                                         )
                    Plaintiffs,                          )     **ORDER**
                                                         )
vs.                                                      )
                                                         )
                                                         )
Sheila Sullivan Polk et al.,                             )
                                                         )
                    Defendants.                          )
                                                         )
_____                 )

## I. Background

The Prescott Area Narcotics Task Force ("PANT") is an intergovernmental organization comprised of Yavapai County area municipalities and aimed to reduce unlawful narcotics activities. Officer Palguta of the Prescott Valley Police Department was assigned to the PANT. Acting in his PANT capacity, he obtained a tip from a confidential informant that Bryan Keith Howell, plaintiffs' son, was selling marijuana out of a home in Prescott, Arizona. Accordingly, Officer Palguta applied for and was issued a warrant for a search of the Howell residence.

Plaintiffs Robert Howell and Patti Howell, and their younger son Dillon Howell, were asleep when, at approximately 6:30 a.m., the police arrived to execute the search warrant. The police believed that they would find less than two pounds of marijuana and other drug related paraphernalia inside. They knocked and announced their presence and then forcibly

1   breached the home's steel security door and interior front door.  Robert Howell testified that

2   he heard loud noises and felt the house pulsating, that he grabbed his handgun for protection,

3   and that he entered the living room, at which time the door burst open.  He states that he fired

4   one shot into the doorway in defense of himself and his family, and immediately thereafter,

5   when he realized that the intruders were the police, he dropped his gun and fell to the floor.

6   Robert Howell was arrested and charged with attempted murder, aggravated assault against

7   a police officer, and unlawful discharge of a firearm within the limits of a municipality.  All

8   charges were subsequently withdrawn or dismissed.

9       Plaintiffs assert various constitutional claims pursuant to 42 U.S.C. § 1983 for harms

10  arising out of this incident.  Plaintiffs name two general categories of defendants: defendants

11  Hodap, Palguta, Johnson, Wylie, Wilcoxson, Gronek and Bonney because they executed the

12  search as a PANT unit  (collectively, "PANT Defendants"); and defendants Polk, Reed,

13  Benner, Huntsman, Buchanan, Schatz, Spence, Jones, Vernier, Wischmeyer, Muma,

14  O'Hagan, and Schmidt because they comprise the PANT Board, which governs the PANT

15  (collectively, "Board Defendants").  Defendants, however, have divided themselves into

16  three groups:  defendants Polk, Buchanan, O'Hagan, and Johnson (collectively, "Yavapai

17  County Defendants"); defendants Huntsman, Schatz, Spence, Jones, Vernier, Wischmeyer,

18  Muma, Schmidt, Palguta, Wylie, Wilcoxson, and Gronek (collectively, "Huntsman

19  Defendants"); and  defendants Reed, Benner, Hodap and Bonney (collectively, "Prescott

20  Defendants").

21      The court has before it Plaintiffs' Motion for Partial Summary Judgment (doc. 64),

22  Yavapai County Defendants' Response (doc. 68), Huntsman Defendants' Response (doc. 86),

23  Plaintiffs' Reply to Yavapai County Defendants' Response (doc. 88), Plaintiffs' Reply to

24  Huntsman Defendants' Response (doc. 106), Plaintiffs' Supplemental Pleading (doc. 119),

25  Huntsman Defendants' Objection (doc. 122), Yavapai County Defendants' Joinder (doc. 127),

26  and Plaintiffs' Response to Huntsman Defendants' Objection (doc. 125).  The court also has

27  before it Prescott Defendants' Phase I Motion for Partial Summary Judgment (doc. 62) and

28  Plaintiffs' Response (doc. 95); Yavapai County Defendants' Joinder (doc. 67); Yavapai

County Defendants' Motion for Summary Judgment (doc. 68), Plaintiffs' Response (doc. 94), and Yavapai County Defendants' Reply (doc. 101); Huntsman Defendants' Motion for Summary Judgment (doc. 82), Plaintiffs' Response (doc. 105), and Huntsman Defendants' Reply (doc. 115); Prescott Defendants' Phase II Motion for Partial Summary Judgment (doc. 120), Plaintiffs' Response (doc. 128), and Prescott Defendants' Reply (doc. 131).  The court also has before it Plaintiffs' Motion to Strike Yavapai County Defendants' Statement of Facts (doc. 89), Yavapai County Defendants' Response (doc. 98), and Plaintiffs' Reply (doc. 111); Plaintiffs' Motion to Strike Prescott Defendants' Statement of Facts (doc. 93); Yavapai County Defendants' Motion to Strike Plaintiffs' Supplemental Statement of Facts (doc. 100), Plaintiff's Response (doc. 110), and Yavapai County Defendants' Reply (doc. 113); Plaintiffs' Motion to Strike Huntsman Defendants' Statement of Facts (doc. 107), Huntsman Defendants' Response (doc. 116), and Plaintiffs' Reply (doc. 117); Huntsman Defendants' Motion to Strike Plaintiffs' Second Supplemental Statement of Facts (doc. 123), Yavapai County Defendants' Joinder (doc. 126), and Plaintiffs' Response (doc. 124); and Plaintiffs' Motion to Strike Prescott Defendants' Motion for Summary Judgment (doc. 128) and Prescott Defendants' Response (doc. 131).  The court also has before it Prescott Defendants' Motion for an Extension of Time to Disclose an Expert Witness (doc. 77) and Plaintiffs' Response (doc. 80).

## II. Ambiguity in the Complaint

A complaint must set forth " 'a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." Conley v. Gibson, 355 U.S. 41, 47, 78 S. Ct. 99, 103 (1957) (quoting Fed. R. Civ. P. 8(a)(2)). In the first through the fourth claims for relief, plaintiffs claim that the PANT Defendants violated plaintiffs' due process and Fourth Amendment rights in obtaining the search warrant, in executing the search warrant, in restraining both plaintiffs, and in arresting Robert

1    Howell.[1]  With regard to each of these claims, plaintiffs raise related supervisory liability

2    claims against 16 defendants for the failure to train and failure to supervise the PANT

3    Defendants.  The complaint is, however, frustratingly unclear because plaintiffs fail to

4    identify which of these supervisory liability claims are asserted against which of the 16

5    defendants.

6         Of the 16 defendants, 15 are Board Defendants, and the other is defendant Hodap, the

7    supervisor of the PANT Defendants.  Defendant Hodap's name is not distinguished in any

8    way, but rather is buried as name 10 in the list of 15 Board Defendants, and is therefore

9    overshadowed and easily overlooked.  It was not obvious to the court that plaintiffs asserted

10   a failure to train or failure to supervise claim against defendant Hodap.  It was not obvious

11   to defendants either, because despite the extensive summary judgment briefings on every

12   other claim presented, no defendant even referenced a failure to supervise or failure to train

13   claim against defendant Hodap.  Plaintiffs never clarified this matter in their briefings

14   because they did not move for summary judgment on any of the failure to train and failure

15   to supervise claims, explicitly noting that these claims should be decided by the jury.[2]

16   Therefore, to the extent that plaintiffs intended to raise claims against defendant Hodap for

17   the failure to train or the failure to supervise the other defendants, those claims fail because,

18   by virtue of plaintiffs' ambiguous pleading, plaintiffs failed to give the requisite notice to

19   defendants.

20

21   _____

22   [1] In Claim Five, plaintiffs claim that defendant Polk violated Robert Howell's right to
     a fair trial by influencing a juror.  Yavapai County Defendants contend that plaintiffs
23   voluntarily withdrew that claim.  Yavapai County Defendants Phase I Motion for Summary
     Judgement at 3.  However, plaintiffs have not filed a stipulation of dismissal or moved for
24   dismissal as required by Rule 41, Fed. R. Civ. P.  At all events, plaintiffs do not dispute
     Yavapai County Defendants' contention, nor do they reference Claim Five in any of their
25   numerous briefings.  We interpret this as agreement, and accordingly, we dismiss Claim Five.
26
     [2] In their supplemental statement of facts, plaintiffs include some evidence with regard
27   to defendant Hodap's supervisory abilities, but, without more, this is insufficient to give
28   defendants fair notice of a claim against defendant Hodap for supervisory liability.

1    It is also unclear whether plaintiffs allege that Board Defendants are liable for both
2    the failure to train and the failure to supervise, or solely for the failure to train.   The
3    complaint suggests that Board Defendants are liable for both, but plaintiffs failed to address
4    the failure to supervise claims in any of their numerous pleadings.   Defendants moved for
5    summary judgment on the failure to supervise claims against Board Defendants (docs. 62,
6    68, 82), but plaintiffs failed to respond, Plaintiffs' Response to Yavapai County Defendants'
7    Motion for Summary Judgment at 11-17 (responding only to defendants' motion for summary
8    judgment with regard to the failure to train claims).   Failure to respond to a motion "may be
9    deemed a consent to the . . . granting of the motion, and the Court may dispose of the motion
10   summarily."  LRCiv 7.2(i).  Therefore, to the extent that plaintiffs intended to raise claims
11   against Board Defendants for the failure to supervise PANT Defendants, we grant
12   defendants' motions for summary judgment on those claims (docs. 62, 68, 82).

13   We surmise that plaintiffs intended to raise claims against defendant Hodap for the
14   failure to supervise, and against Board Defendants for the failure to train, but that was far
15   from obvious in the complaint.   In fact, plaintiffs' complaint is rife with confusion with
16   regard to the failure to train and failure to supervise claims, with regard to the personal
17   capacity and official capacity claims, and with regard to the claims for judicial deception,
18   which were never clearly articulated, and which in the complaint are merged in the same
19   sentence with the claims for the unlawful execution of the search warrant.   Only now
20   recognizing this, we regret that we denied Yavapai County Defendants' motion for a more
21   definite statement (doc. 47).

22   It is however obvious to the court and to all parties that plaintiffs claim that Board
23   Defendants are liable in their personal capacities for the failure to train PANT Defendants
24   with regard to the acts alleged in the first through the fourth claims for relief.   Plaintiffs also
25   claim that all defendants are liable in their official capacities for the first through the fourth
26   claims for relief.   Official capacity suits are "another way of pleading an action against an
27   entity of which an officer is an agent."  Hafer v. Melo, 502 U.S. 21, 25, 112 S. Ct. 358, 361
28   (1991) (quotation omitted).  Therefore, through the vehicle of the official capacity claims,

1   it appears that plaintiffs claim that the municipalities for which each defendant is employed

2   are liable for the failure to adequately train PANT Defendants.  We consider these failure to

3   train claims below.

### III.  Claim One:  Substantive Due Process

5   Plaintiffs claim that PANT Defendants violated plaintiffs' Fourteenth Amendment

6   substantive due process rights by obtaining and executing the search warrant in an arbitrary

7   and oppressive manner.  Complaint at 11.  Plaintiffs also raise the related claims for

8   inadequate training.  Id. at 11-12.  The Fourth Amendment, which safeguards the people

9   from the governments' unreasonable execution of searches, is the proper avenue for relief

10  with regard to these claims.  "Where a particular Amendment provides an explicit textual

11  source of constitutional protection against a particular sort of government behavior, that

12  Amendment, not the more generalized notion of substantive due process, must be the guide

13  for analyzing these claims."  Albright v. Oliver, 510 U.S. 266, 273, 114 S. Ct. 807, 813

14  (1994) (quotation omitted).  Accordingly, "substantive due process, with its scarce and open-

15  ended guideposts can afford [plaintiffs] no relief."  Id. (quotation omitted).  We therefore

16  grant defendants' motions for summary judgment  (docs. 62, 67, 68, 82) and deny plaintiffs'

17  motion for summary judgment (doc. 64) on these claims.

### IV.  Claim Two: Judicial Deception

19  Judge Weaver of the Yavapai County Superior Court issued a warrant for the search

20  of 543 Dameron Street, Prescott–the Howell residence–based upon an affidavit issued, and

21  statements made, by defendant Palguta.  Plaintiffs' Statement of Facts ("PSOF"), Exhibit 4

22  at 8-9, Exhibit 5 at 1.  Plaintiffs claim that PANT Defendants violated plaintiffs' Fourth and

23  Fourteenth Amendment rights by knowingly, intentionally, or with reckless disregard for the

24  truth, issuing false or misleading statements in the affidavit, which were necessary to the

25  finding of probable cause.  Complaint at 12; Response to Huntsman Defendants' Motion for

26  Summary Judgment at 5.  Plaintiffs also raise the related claims for inadequate training.

27  Complaint at 11-12.  Plaintiffs and defendants move for summary judgment on these claims

28  (docs. 62, 64, 67, 68, 82).

## A.  Personal Capacity Claim Against Defendant Palguta

An officer who submits an affidavit in support of an application for a search warrant commits a Fourth Amendment violation where he "intentionally or recklessly" includes false or misleading facts in the affidavit, or "omit[s] facts required to prevent technically true statements . . . from being misleading."  Liston v. County of Riverside, 120 F.3d 965, 973 (9th Cir. 1997) (quoting United St]ates v. Stanert, 762 F.2d 775, 781 (9th Cir. 1985), as amended, 769 F.2d 1410 (9th Cir. 1985)).  Defendant Palguta claims that he did neither, and that at all events, he is entitled to qualified immunity.  To survive a motion for summary judgment premised on these defenses, the plaintiff has the burden to:

> 1) make a substantial showing of deliberate falsehood or reckless disregard for the truth and 2) establish that, but for the dishonesty, the challenged action would not have occurred.  If a plaintiff satisfies these requirements, the matter should go to trial.  Put another way, the showing necessary to get to a jury in a 1983 action is the same as the showing necessary to get an evidentiary hearing under Franks [v. Delaware, 438 U.S. 154, 98 S. Ct. 2674 (1978)].[3]

Liston, 120 F.3d at 973 (quotations omitted).

---

[3] An officer will be protected by qualified immunity if he can show that the law was not so clear that a reasonable officer would have understood that what he was doing violated a right.  Hope v. Pelzer, 536 U.S. 730, 739, 122 S. Ct. 2508, 2515 (2002).  Normally, when considering a motion for summary judgment based upon the defense of qualified immunity, the court must consider first whether the "officers' conduct violated a constitutional right," and if so, then consider "whether the right was clearly established."  Saucier v. Katz, 533 U.S. 194, 201, 121 S. Ct. 2151, 2156 (2001).  With regard to judicial deception claims, however, the Court of Appeals merged the analysis into one test.

> Th[e] merger is ultimately appropriate because . . . no reasonable officer could believe that it is constitutional to act dishonestly or recklessly with regard to the basis for probable cause in seeking a warrant.  Accordingly, should a factfinder find against an official on the state-of-mind question, qualified immunity would not be available as a defense.  On the other hand, should the fact-finder find at trial in the officer's favor, i.e., that he did not act dishonestly or recklessly, that officer's conduct would not have violated any clearly established statutory or constitutional rights.

Butler v. Elle, 281 F.3d 1014, 1024 (9th Cir. 2002).

1    Plaintiffs argue that Palguta displayed at least a reckless disregard for the truth in his

2    application for the search warrant.  Palguta's affidavit in support of the application for the

3    search warrant states that a "confidential reliable informant saw a useable/saleable quantity

4    of marijuana . . . in the living area of the residence listed here in [sic] and in the possession

5    of BRYAN KEITH HOWELL within the last 72 hours."  PSOF, Exhibit 4 at 4.  The affidavit

6    does not specify the means by which the informant obtained the information.  Judge Weaver

7    declared that Palguta "advised [him] or led [him] to believe that the activities of the

8    confidential reliable informant were the result of a 'controlled buy,' " meaning a buy

9    monitored by law enforcement officers.  PSOF, Exhibit 5 at 1.  However, Palguta later

10   testified that the information was acquired through a "look-see buy," PSOF, Exhibit 7 at 15-

11   20, Exhibit 8 at 39-42, which is not monitored by law enforcement officers, PSOF, Exhibit

12   5 at 1.

13   Furthermore, the affidavit states that the confidential informant saw the marijuana at

14   the residence at 543 Dameron Street.  PSOF, Exhibit 4 at 1, 4.  However, Palguta later stated

15   that the confidential informant was not clear with regard to the address of the buy, that the

16   informant believed the address included a half-number (e.g., 543 ½ Dameron Street), and that

17   the officers "just assumed that [the residence at 543 Dameron Street] was the residence"

18   where the confidential informants saw the marijuana.  PSOF, Exhibit 7 at 17-19.[4]  The

19   affidavit describes the residence as a "blue stick built house," but Palguta stated that the

20   confidential informants just revealed the address of the house; the color of the house was

21   acquired by the officers when they later "drove by."  PSOF, Exhibit 7 at 19.  Increasing

22   confusion, plaintiffs set forth the "initial affidavit for search warrant prepared by Palguta"

23   which refers to "545 Dameron St[.]," a "pink stick" house.  PSOF ¶ 28, Exhibit 10 at 1.

24   _____

25   [4] Defendant Palguta subsequently recanted his statements with regard to the address.
     "The informant didn't say that [the address included a half-number]."  PSOF, Exhibit 6 at 36.

26   "I later realized–it was after speaking with Detective Johnson.  Detective Johnson advised

27   me [that] the informant gave the correct number.  It was I that believed it could have been
     a half number due to the configuration of the numbers on a placard outside of the residence."

28   Id.

1    Despite all of the confusion, Palguta never attempted to verify that Bryan Howell lived at 543

2    Dameron Street.  PSOF, Exhibit 7 at 26.  The affidavit in support of the application for the

3    search warrant does not reference any of the confusion with regard to the address.  This is

4    substantial evidence from which a jury could find that Palguta displayed at least a reckless

5    disregard for the truth with regard to the evidence he presented in support of the application

6    for the search warrant.[5]

7            Therefore, we must shear away the objectionable material, and include the omitted

8    material, and determine if the affidavit provides a "substantial basis" for concluding that

9    probable cause existed to search the residence at 543 Dameron Street.  See Stanert, 762 F.2d

10   at 782.  We conclude that the affidavit does not provide a substantial basis for concluding

11   that probable cause existed.  The amended affidavit merely provides that a confidential

12   informant, who is a former methamphetamine user and who twice within the previous six

13   months aided the police by making controlled buys of methamphetamines, saw a

14   useable/saleable quantity of marijuana at a house on Dameron Street during a buy that was

15   not monitored by law enforcement, and despite confusion with regard to the address, the

16   police assumed the house number to be 543.[6]  See PSOF, Exhibit 4.

17          Plaintiffs have set forth sufficient evidence to survive defendants' motions for

18   summary judgment on this judicial deception claim.  However, the determination of Palguta's

19

20

21          [5] Plaintiffs also argue that Palguta incorrectly referred to Bryan Keith Howell in the

22   affidavit as both Bryan Keith Howell and Bryan Keith Kelly, to which Palguta offers a

23   variety of apparently inconsistent justifications.  While we agree with plaintiffs that the

      inconsistencies are of concern, and they may be relevant for impeachment purposes, we do

24   not agree that they are material to the probable cause inquiry.

25          [6] Moreover, Judge Weaver, who issued the search warrant, declared that had he been

26   aware that "PANT officers took no action to confirm that the residence address of 543

      Dameron St., Prescott, Arizona was the residence of the subject Bryan Keith Howell" and

27   had he been aware "that there was no 'controlled buy' but only a 'look see buy' that had not

      been monitored nor surveil[l]ed by law enforcement," he would not have signed the search

28   warrant.  PSOF, Exhibit 5.

1   mental state hinges on disputed issues of fact.  Therefore, we deny all motions for summary

2   judgment on this claim (docs. 62, 64, 67, 68, 82).

3                **B.  Personal Capacity Claims Against the Remaining PANT Defendants**

4       An officer will only be liable for a constitutional violation if he was an integral

5   participant in the allegedly unconstitutional act.  Boyd v. Benton County, 374 F.3d 773, 780

6   (9th Cir. 2004).  Plaintiffs, however, fail to submit any evidence that any other PANT

7   Defendant aided Palguta in obtaining the search warrant.  Therefore, to the extent that

8   plaintiffs direct their claim for judicial deception against the other PANT Defendants for

9   participating in the judicial deception, those claims fail as a matter of law.  Accordingly, we

10   grant defendants' motions for summary judgment (docs. 62, 67, 68, 82) and deny plaintiffs'

11   motion for summary judgment (doc. 64) on these claims.

12                **C.  Personal Capacity Claims Against Board Defendants**

13       Plaintiffs also claim that Board Defendants are liable in their personal capacities for

14   failing to adequately train PANT Defendants with regard to obtaining search warrants.

15   Complaint at 13.  "Under [s]ection 1983, supervisory officials are not liable for actions of

16   subordinates on any theory of vicarious liability," Hansen v. Black, 885 F.2d 642, 645-46

17   (9th Cir. 1989), and therefore "rigorous standards of culpability and causation must be

18   applied" to avoid holding a supervisor liable for the actions of its subordinate, Board of the

19   County Comm'rs v. Brown, 520 U.S. 397, 405, 117 S. Ct. 1382, 1389 (1997); accord City

20   of Canton v. Harris, 489 U.S. 378, 391, 109 S. Ct. 1197, 1206 (1989).  Accordingly, we are

21   skeptical that, as a matter of section 1983 law, the failure to train an officer could ever

22   proximately cause the officer to act with a reckless disregard for the truth.  However, to the

23   extent that such liability is feasible, it does not exist here because plaintiffs fail to produce

24   any evidence from which to conclude that the failure to train Palguta with regard to search

25   warrants proximately caused him to act with a reckless disregard for the truth.  We therefore

26   grant defendants' motions for summary judgment (docs. 62, 67, 68, 82) and deny plaintiffs'

27   motion for summary judgment (doc. 64) on these claims.

28

1

**D.  Official Capacity Claims Against all Defendants for the Failure to Train**

Plaintiffs also claim that all defendants are liable in their official capacities for the failure to train PANT Defendants with regard to obtaining search warrants.  In an official capacity suit, the real party in interest is the municipality, which cannot be liable on a theory of vicarious liability, and can only be liable if the harm arose out of the entity's official policy or custom.  Hafer v. Melo, 502 U.S. 21, 25, 112 S. Ct. 358, 361 (1991).  As with supervisory liability, "rigorous standards of culpability and causation must be applied" to avoid holding a municipality liable for the actions of its employees.  Board of the County Comm'rs v. Brown, 520 U.S. at 405, 117 S. Ct. at 1389.  As previously articulated, plaintiffs fail to produce any evidence from which to conclude that the failure to train Palguta with regard to search warrants proximately caused him to act with a reckless disregard for the truth.  Accordingly, we grant defendants' motions for summary judgment (docs. 62, 67, 68, 82) and deny plaintiffs' motion for summary judgment (doc. 64) on these claims.

**V.  Claim Two:  Unconstitutional Execution of Search Warrant**

Plaintiffs claim that PANT Defendants violated plaintiffs' Fourth and Fourteenth Amendment rights by executing the warrant in an unreasonable manner.  Complaint at 12-13.  Plaintiffs also raise the related claims against all defendants for inadequate training.  Id.  Plaintiffs and defendants move for summary judgment on these claims (docs. 62, 64, 67, 68, 82).

**A.  Personal and Official Capacity Claims Against Defendant Polk**

In a related criminal case in Yavapai County Superior Court, State of Arizona v. Robert Howell, Judge Sterling concluded that defendants executed the search warrant at issue in violation of the United States Constitution.  Prescott Defendants' Statement of Facts ("PDSOF"), Exhibit K at 3.  There, the state was represented by Deputy County Attorney Steven Young of the Yavapai County Attorney's Office, a subordinate of defendant Polk, the Yavapai County Attorney.[7]  Yavapai County Defendants Statement of Facts ¶¶ 98-99.

---

[7] Polk is a defendant in this action in her role as a PANT board member.

- 11 -

1    Plaintiffs argue that Polk is estopped from relitigating the issue of the constitutionality of the

2    execution of the search warrant.  The parties dispute whether Polk was in privity with the

3    State of Arizona in the underlying criminal action, and therefore whether she is bound by the

4    underlying decision.

5         "The doctrine of collateral estoppel bars the relitigation of issues that were resolved

6    in a prior proceeding . . . ."  Fund for Animals, Inc. v. Lujan, 962 F.2d 1391, 1399 (9th Cir.

7    1992) (citation omitted).  It "relieve[s] parties of the cost and vexation of multiple lawsuits,

8    conserve[s] judicial resources, and, by preventing inconsistent decisions, encourage[s]

9    reliance on adjudication."  Allen v. McCurry, 449 U.S. 90, 94, 101 S. Ct. 411, 415 (1980).

10   It is an equitable doctrine over which the district court has broad discretion.  Copeland v.

11   Merrill Lynch & Co., Inc., 47 F.3d 1415, 1423 (5th Cir. 1995).

12        Even assuming that Polk was in privity with the state in the underlying action, we

13   decline to bar her from relitigation because none of the policies underlying the doctrine of

14   collateral estoppel would be served.  The constitutionality of the search must be litigated

15   between plaintiffs and the remaining 19 defendants, three of whom are represented by Polk's

16   counsel.  Therefore, barring Polk from relitigation will not decrease the cost or vexation of

17   litigation on either the parties or the court.  Moreover it would create the very real risk of

18   inconsistent outcomes.  A jury could reach the incongruous conclusion that PANT

19   Defendants constitutionally executed the search, but Polk is liable for failing to train PANT

20   Defendants as to how to constitutionally execute a search.  Therefore, we deny plaintiffs'

21   motion for partial summary judgment against defendant Polk on the issue of collateral

22   estoppel (doc. 64).

23              **B.  Personal Capacity Claims Against Yavapai County Defendants**

24        Defendant Johnson moves for summary judgment arguing that he "did not participate

25   in, or time, the knock and announce, and did not forcibly enter Plaintiffs' home."  Yavapai

26   County Defendants' Phase I Motion for Summary Judgment at 12.  An officer can be liable

27   under section 1983 if he was an integral participant–a "full, active participant"–in the

28   allegedly unconstitutional search even if his actions did not individually "rise to the level of

1    a constitutional violation." <u>Boyd v. Benton County</u>, 374 F.3d 773, 780 (9th Cir. 2004)

2    (quoting <u>Melear v. Spears</u>, 862 F.2d 1177, 1186 (5th Cir. 1989)).  For example, an officer

3    that did not enter an apartment, and only provided armed backup at the door during a search

4    is integral to the search and therefore can be liable when the search is found to be

5    unconstitutional.  <u>Id</u>. (citing <u>Melear</u>, 862 F.2d at 1186).  However, an officer will not be

6    liable if he acts as a mere bystander during a search.  <u>Id</u>.

7        Johnson states that he was second in the lineup during the search, "behind Detective

8    Palguta making entry." <u>PSOF, Exhibit 8</u> at 221.  The fact that Johnson never made entry due

9    to the shooting is irrelevant, because it is unnecessary for the officer to enter the residence

10   to be an integral participant in the search. <u>See</u> <u>Melear</u>, 862 F.2d at 1186.  Johnson's position

11   in the lineup is sufficient to allow a jury to conclude that he was an integral participant.

12       Johnson argues, however, that because he did not know that the search was being

13   conducted unconstitutionally, and because he did not time the waiting period between the

14   knock and announce and the breach, which is the fundamental alleged insufficiency, he

15   cannot be considered an integral participant.  Knowledge of the unconstitutional element is,

16   however, unnecessary to sustain liability.  In <u>Boyd</u>, although the court considered that "every

17   officer was aware of the decision to use the flash-bang," the unconstitutional element, that

18   knowledge was not necessary to the holding.  <u>Boyd</u>, 374 F.3d at 780.  <u>Boyd</u> cited with

19   approval <u>Melear v. Spears</u>, 862 F.2d 177 (5th Cir. 1989) and <u>James ex rel. James v. Sadler</u>,

20   909 F.2d 834 (5th Cir. 1990), neither of which considered knowledge of the actual

21   unconstitutionality as a requirement to integral participant liability.  <u>Id</u>.  It is merely

22   necessary to be integral to the search.  Accordingly, we deny defendant Johnson's motion for

23   summary judgment on this claim based upon this argument (doc. 68).

24       Defendants Polk, Buchanan, and O'Hagan, the Yavapai County Board Defendants,

25   also move for summary judgment arguing that they cannot be liable for the failure to train

26   because Johnson was not integral to the constitutional violation.  Yavapai County

27   Defendants' argument fails because Johnson was integral to the violation.  Moreover,

28   defendants' argument fails because it misconstrues plaintiffs' theory of liability.  The PANT

1   Board governs the PANT.  PSOF, Exhibit 1 at 6.  Plaintiffs claim that the PANT Board is

2   responsible for training all PANT officers, and that all Board Defendants are liable for failing

3   to adequately train all PANT Defendants with regard to the execution of search warrants.

4   There is no evidence to show that PANT Board members were only responsible for the

5   functioning of the PANT with regard to PANT officers employed by a common

6   municipality.[8]  Therefore, with regard to this claim, it is irrelevant whether Board Defendants

7   and PANT Defendants are employed by the same municipality.  Even if Johnson were not

8   integral to the violation, defendants Polk, Buchanan, and O'Hagan could still be found liable

9   for failing to adequately train the PANT Defendants that were integral to the violation.  We

10  therefore deny Polk, Buchanan, and O'Hagan's motion for summary judgment on these claims

11  based upon these arguments (doc. 68).  We consider below whether Board Defendants as a

12  whole can be held liable for the failure to train PANT Defendants with regard to the

13  execution of search warrants.

14              **C.  Personal Capacity Claims Against All PANT Defendants**

15          The Fourth Amendment protects the people from unreasonable governmental searches

16  and seizures.  To make a search reasonable, the police must knock and announce their

17  presence, and wait a reasonable period of time for the occupants to admit them or refuse them

18  entry.  Wilson v. Arkansas, 514 U.S. 927, 931-36, 115 S. Ct. 1914, 1916-19 (1995).

19  However, the police may enter either without knocking and announcing their presence, or

20  shortly after knocking and announcing their presence, when exigent circumstances arise, such

21  as the risk that evidence could be destroyed.  Id. at 936, 115 S. Ct. at 1919; United States v.

22  Banks, 540 U.S. 31, 40, 124 S. Ct. 521, 527-28 (2003).  Although drug evidence can often

23  be quickly and easily destroyed, there is no blanket exception to the knock and announce rule

---

25          [8] The intergovernmental agreement which established the PANT states that "each

26  [municipality] shall be solely responsible for its own acts or omission and those of its officers

27  and employees by reason of its operations under this agreement."  PSOF, Exhibit 1 at 10.

28  While this provision may affect the distribution of ultimate liability among the parties to the

    agreement, it cannot supplant federal constitutional law with regard to supervisor liability.

for suspected drug crimes.  Richards v. Wisconsin, 520 U.S. 385, 394, 117 S. Ct. 1416, 1421 (1997).  Therefore, to make an expedited entry, the police must have particularized evidence showing that evidence could be quickly destroyed.  Id.

PANT Defendants argue that their forced entry into the Howell residence was justified by the risk that evidence could have been quickly destroyed.  They submit evidence to show that the house was small, and that they reasonably believed the quantity of marijuana within to be small, PDSOF, Exhibit B at 2-3, and argue that, accordingly, the occupants could have quickly disposed of the marijuana.  Plaintiffs argue, however, that Richards requires officers to set forth evidence showing that the occupants would have disposed of drug evidence, not only that they could have quickly disposed of the drug evidence.  We disagree.

In rejecting the categorical exception to the knock and announce rule in drug cases, Richards states the following:

> while drug investigation frequently does pose special risks to . . . the preservation of evidence, not every drug investigation will pose these risks to a substantial degree.  For example, a search could be conducted at a time when the only individuals present in a residence have no connection with the drug activity and thus will be unlikely to . . . destroy evidence.  Or the police could know that the drugs being searched for were of a type or in a location that made them impossible to destroy quickly.  In those situations, the asserted governmental interest[] in preserving evidence . . . may not outweigh the individual privacy interests intruded upon by a no-knock entry.

Richards, 520 U.S. at 393, 117 S. Ct. at 1421.  Richards therefore states that an exigency will not arise when the police have evidence that occupants would not quickly destroy evidence.  It does not state that an exigency will not arise unless the police have evidence that the suspect would destroy evidence.  This is reasonable, because the police would rarely have evidence to show that a suspect would destroy drug evidence, and requiring as much would create an unreasonable bar to the collection of evidence in drug cases.  Accordingly, in Banks, the Supreme Court concluded that "what matters is the opportunity to get rid of cocaine."  Banks, 540 U.S. at 40, 124 S. Ct. at 527 ("The significant circumstances include the arrival of the police during the day, when anyone inside would probably have been up and around, and the sufficiency of 15 to 20 seconds for getting to the bathroom or the kitchen

to start flushing cocaine down the drain.").[9]  Therefore, PANT Defendants' evidence that the occupants could have quickly disposed of drug evidence is sufficient to show exigent circumstances.[10]

However, such exigent circumstances do not arise immediately, but rather arise at the point when, considering the totality of the circumstances, the police have an objectively reasonable suspicion that the drug evidence could be disposed of if they wait any longer.  See Banks, 540 U.S. at 38-40, 124 S. Ct. at 526-27; Scott v. United States, 436 U.S. 128, 137, 98 S. Ct. 1717, 1723 (1978).  Here, the relevant inquiry is whether–at approximately 6:30 a.m.,

---

[9] Moreover, Banks cited with approval a series of post-Richards Court of Appeals decisions that made findings of exigent circumstances upon the presence of easily disposable drug evidence, without any specific evidence that the suspect would dispose of that evidence: United States v. Goodson, 165 F.3d 610, 614 (8th Cir. 1999) (finding a 20 second wait sufficient "considering the size of the house . . . and the potential that the residents could flush crack cocaine down a toilet"); United States v. Spikes, 158 F.3d 913, 926 (6th Cir. 1998) (finding a 15-30 second wait sufficient because "the presence of drugs in the place to be searched, while not a conclusive factor, lessens the length of time law enforcement must ordinarily wait outside before entering a residence"); United States v. Jones, 133 F.3d 358, 361 (5th Cir. 1998) ("In drug cases, where drug traffickers may so easily and quickly destroy the evidence of their illegal enterprise by simply flushing it down the drain, 15 to 20 seconds is certainly long enough for officers to wait before assuming the worst and making a forced entry.").  Banks, 540 U.S. at 38 n. 5, 124 S. Ct. at 526 n.5.

[10] PANT Defendants also argue that an exigency arose from the increased risk of harm to the officers due to Bryan Howell's criminal history.  To the extent that there is some criminal history, defendants have not identified any evidence that it was violent or that the officers believed it to have been violent when determining that exigent circumstances existed.  See PDSOF, Exhibit B at 2-3.  Moreover, the police had no evidence that any resident possessed firearms or other weapons.  Id.  Accordingly, we disregard this factor.  We also disregard PANT Defendants argument that an exigency arose because, although the warrant was executed on a weekday at 6:30 a.m., when "working residents may be assumed to be home and awake, or ready to awaken and prepare for the work day, and able to respond to a knock and announce," Prescott Defendants Phase I Amended Motion for Partial Summary Judgment at 10, the residents did not quickly respond.  To the contrary, defendant Hodap testified that the officers executed the warrant at 6:30 a.m. with the hope that the family would be asleep.  PSOF, Exhibit 8 at 155.  Moreover, a slow response is not sufficient to create an exigency in itself, but is a factor to be considered in determining whether officers have been constructively refused entry.

when the suspects were expected to be sleeping in their small house where the front door is protected by a steel security door–the police had an objectively reasonable suspicion that if they did not begin to breach the security door when they did, the suspects could destroy the marijuana before the police could stop them.

To determine if the police acted reasonably, we must determine the period of time that an officer would reasonably expect it would take to breach the security door. Defendant Hodap, who was in command during the execution of the search warrant, PSOF, Exhibit 8 at 149, testified that before the breach, it was "difficult to estimate the time it might take to force [it] open." PDSOF, Exhibit B at 3. It is undisputed that it took at least 20 seconds to open the security door. PSOF, Exhibit 8 at 96. Neither party has argued that 20 seconds was an unreasonable amount of time to open the door, nor has either party submitted evidence as to the amount of time a reasonable officer would expect that it would take to open the security door. Accordingly, we conclude that 20 seconds is an objectively reasonable estimate for the amount of time that it would take to breach the security door.

We must also determine the amount of time that the police waited after knocking and announcing their presence before attempting to breach the security door. The officers have varying recollections of the length of the waiting period: Detective Del Rio, who participated in the search at issue, testified that the attempt to breach the security door began as the officers began to knock and announce their presence, meaning there was no waiting period. PSOF, Exhibit 16 at 12. Defendant Hodap testified that there was a 5 second waiting period, PDSOF, Exhibit B at 4, and defendant Palguta testified that there was a 5-8 second waiting period, PDSOF, Exhibit C at 94.

With regard to defendants' motions for summary judgment, we consider the facts in the light most favorable to the plaintiffs–that there was no waiting period. Having begun to breach the security door immediately upon commencing the knock and announcement, the police would reasonably expect to be through the security door, and prepared to breach the front door after approximately 20 seconds. This time frame is substantially similar to that in Banks. There, the Supreme Court determined that although "th[e] call is a close one," the

1    police acted constitutionally by forcibly entering a small apartment in the afternoon "when
2    anyone inside would probably have been up and around," 15-20 seconds after hearing no
3    response to their knock and announcement, where there was a concern that the suspects
4    would dispose of their cocaine. <u>Banks</u>, 540 U.S. at 38-40, 124 S. Ct. at 526-27. This case
5    is distinguished from <u>Banks</u>, however, because here the search took place in the early
6    morning, when the residents were expected to be asleep, whereas there the search took place
7    in the early afternoon, when residents were expected to be awake. Exigent circumstances
8    will arise more slowly if the suspects are asleep because it would take them time to awaken
9    before being able to dispose of evidence. Because 15-20 seconds was a close call in <u>Banks</u>,
10   20 seconds cannot be constitutional here where the residents were expected to be sleeping.

11        Moreover, by freeing ourselves from the thicket of Fourth Amendment jurisprudence,
12   and considering the essential purpose of the Fourth Amendment, we can more clearly see that
13   PANT Defendants' actions were unconstitutional when viewed in the light most favorable
14   to the plaintiffs. The Fourth Amendment "impose[s] a standard of reasonableness upon the
15   exercise of discretion by . . . law enforcement agents, in order to safeguard the privacy and
16   security of individuals against arbitrary invasions." <u>Delaware v. Prouse</u>, 440 U.S. 648, 653-
17   54, 99 S. Ct. 1391, 1396 (1979) (quotation omitted). "[T]he permissibility of a particular law
18   enforcement practice is judged by balancing its intrusion on the individual's Fourth
19   Amendment interest against its promotion of legitimate governmental interests." <u>Id</u>. at 654,
20   99 S. Ct. at 1396. Balancing those interests, we conclude that it is unreasonable–and
21   therefore unconstitutional–for PANT Defendants to forcibly enter the Howell residence
22   without warning at approximately 6:30 a.m., when the residents were expected to be
23   sleeping, in an effort to seize less than two pounds of marijuana.

24        Having found PANT defendants conduct unconstitutional when viewed in the light
25   most favorable to the plaintiffs, we consider whether defendants are protected by qualified
26   immunity. An officer will be protected by qualified immunity if he can show that the law
27   was not so clear that a reasonable officer would have understood that what he was doing
28   violated a right. <u>Hope v. Pelzer</u>, 536 U.S. 730, 739, 122 S. Ct. 2508, 2515 (2002).

1  "[R]easonableness is judged against the backdrop of the law at the time of the conduct."

2  Brosseau v. Haugen, 543 U.S. 194, 198, 125 S. Ct. 596, 599 (2004).

3        The law was significantly different at the time of the search, which occurred before

4  the Supreme Court decision in Banks.[11]  The Court of Appeals for the Ninth Circuit formerly

5  interpreted Richards more broadly than did the Supreme Court in Banks, and therefore

6  required more particularized evidence to establish exigent circumstances.  For example, when

7  Banks was before the Court of Appeals, that court concluded that evidence that cocaine was

8  being held in a small apartment was insufficient to establish exigent circumstances.  United

9  States v. Banks, 282 F.3d 699, 705 (2002), rev'd, 540 U.S. 31, 124 S. Ct. 521 (2003).  The

10 facts here are substantially similar to those in Banks.  Therefore, the law at the time of the

11 search clearly did not support a finding of exigent circumstances.

12        Moreover, the relevant inquiry was different under the law at the time of the search.

13 In United States v. Chavez-Miranda, 306 F.3d 973 (9th Cir. 2002), where officers executed

14 a search warrant and believed heroin was being kept in a small apartment with at least three

15 occupants, the Court of Appeals stated that because the police knocked and announced their

16 presence, "the issue is not one of the existence of exigent circumstances that would justify

17 entry without notice, but whether the police officers reasonably inferred that they had been

18 constructively refused entry under the Knock and Announce Rule."  Id. at 981 n.5 & 982; see

19 also Banks, 282 F.3d at 705 ("Because the officers were not affirmatively granted or denied

20 permission, they were required to delay acting for a sufficient period of time before they

21 could reasonably conclude that they impliedly had been denied admittance.").  Therefore,

22 despite the risk of the disposal of drug evidence, the inquiry hinged on the time to the door,

23 unlike the current inquiry outlined by the Supreme Court in Banks, which hinges on the time

24 to a bathroom or kitchen to dispose of drug evidence.  Assuming here that the officers

25 breached the security door immediately upon knocking and announcing their presence, they

26 could not possibly have been constructively denied entry.  Therefore, under those facts,

27

28        [11] The search took place on March 5, 2003.  Banks was decided on December 2, 2003.

1  PANT Defendants acted outside of the hazy, near-constitutional aura within which we grant

2  immunity.  Accordingly, we deny defendants' motions for summary judgment on these claims

3  (docs. 62, 67, 68, 82).

4  We next consider plaintiffs' motion for summary judgment, and therefore consider the

5  facts in the light most favorable to the defendants–that there was a waiting period of 8

6  seconds.  Adding the time to breach the security door, the police could have reasonably

7  expected to breach the interior front door approximately 28 seconds after knocking and

8  announcing their presence.  We believe that the police could have reasonably expected that

9  had they waited any longer, the occupants would have had sufficient time to wake up and

10  destroy any drug evidence.  Therefore, assuming PANT Defendants waited 8 seconds, they

11  acted constitutionally.  We recognize with regret that 8 seconds straddle the divide between

12  constitutional and unconstitutional activity.

13  Plaintiffs also argue that the search warrant was unconstitutionally executed because

14  PANT Defendants did not take sufficient pauses after knocking and announcing their

15  presence to determine if anyone inside was responding.  The occupants did not respond to

16  the police announcement, so even if PANT Defendants should have paused, their failure to

17  do so was harmless.[12]

18  Plaintiffs also argue that the search was unconstitutionally executed because the

19  officers did not sufficiently avoid the appearance of chaos, minimize excessive noise from

20  the non-announcing officers, or use a bull horn.  "The 'reasonableness' of a particular use of

21  force must be judged from the perspective of a reasonable officer on the scene, rather than

22  with the 20/20 vision of hindsight,"  Graham v. Connor, 490 U.S. 386, 396, 109 S. Ct. 1865,

23  1872 (1989) (citation omitted), and plaintiffs have submitted no evidence from which to

24  conclude that the officers should have reasonably expected their announcements to be

25  incomprehensible from inside the house.

26

27  _____

28  [12] Plaintiff Robert Howell screamed to his son to get away from the door, PSOF, Exhibit 16 at 69, but that is neither a statement of admittance nor refusal of entry.

1    We conclude that viewing the facts in the light most favorable to defendants, PANT
2  Defendants acted constitutionally.  Accordingly, we need not consider the issue of qualified
3  immunity.  However, because we deny plaintiffs' and defendants' motions for summary
4  judgment with regard to this claim, the issue of qualified immunity could rise again if the
5  jury ultimately concludes that PANT Defendants unconstitutionally searched plaintiffs'
6  residence.  To avoid having to reconsider the issue at a later time, we conclude here that,
7  even viewing the facts in the light most favorable to defendants, the PANT Defendants would
8  not be protected by qualified immunity.  As explained above, qualified immunity is
9  considered under the law at the time of the search, not under the current law.  Under the law
10  at the time, for the search to have been constitutional, PANT Defendants must have been
11  constructively refused entry.  An 8 second wait does not equate to constructive refusal.  See
12  Banks, 282 F.3d at 705 (finding a 15-20 second wait insufficient for a finding of constructive
13  refusal); Chavez-Miranda, 306 F.3d at 982 (finding a 20-30 second wait sufficient for a
14  finding of constructive refusal).  Therefore, regardless of the jury's ultimate conclusion with
15  regard to constitutionality of this waiting period, defendants will not be protected by
16  qualified immunity.

17    For all of these reasons, we deny plaintiffs' motion for summary judgment on these
18  claims (doc. 64).

19    ### D.  Personal Capacity Claims Against All Board Defendants

20    Plaintiffs also claim that Board Defendants are liable in their personal capacities for
21  failing to adequately train PANT Defendants with regard to the execution of search warrants.
22  Complaint at 13.  To hold a supervisor liable for the failure to train under section 1983, a
23  plaintiff must show at least that "in light of the duties assigned to specific officers . . . [,] the
24  need for more or different training [was] so obvious, and the inadequacy so likely to result
25  in the violation of constitutional rights," that the supervisor was deliberately indifferent to
26  that need.  City of Canton, 489 U.S. at 390, 109 S. Ct. at 1205; see L.W. v. Grubbs, 92 F.3d
27  894, 900 (9th Cir. 1996).

28

1    Plaintiffs' only viable argument with regard to the unconstitutional execution claim

2    is that PANT Defendants did not wait for a sufficient period of time after knocking and

3    announcing their presence.  Defendant Hodap "made all [the] decisions for the PANT unit

4    regarding the actual execution of [the] search warrant[]," which included the order to breach

5    the security door.  PSOF ¶¶ 37, 46.  Therefore, to succeed on this claim, plaintiffs must show

6    that Hodap was inadequately trained with regard to the requisite waiting period, that Board

7    Defendants were deliberately indifferent to the need for additional training, and that the

8    training inadequacy proximately caused Hodap to prematurely give the order to enter.

9    Because Hodap gave the entry order, any training inadequacies with regard to the other

10   PANT Defendants are irrelevant.

11   The evidence shows that Hodap received training in narcotics and search warrants in

12   the years prior to the search, PDSOF, Exhibit J, and that he was "the only person in the unit

13   that ha[d] completed formal training in warrant entries."[13] Plaintiffs' Supplemental Statement

14   of Facts ("PSSOF") ¶ 52.  The fact that Hodap received this training from entities other than

15   the PANT is irrelevant.  Hodap also testified to his knowledge that after knocking and

16   announcing their presence, officers are required to wait a reasonable amount of time for the

17   occupants to respond.  PSOF, Exhibit 8 at 138.  It is possible that Hodap was inadequately

18   trained with regard to the length of the requisite waiting period.  However, given the totality

19

20   _____

21   [13] This statement was made in a Needs Assessment dated July 14, 2003, several
     months after the search.  However, plaintiffs neither argue, nor submit evidence to suggest
22   that this training took place after the search at issue.  Yavapai County Defendants object to
     the admission of this evidence on the ground that the Needs Assessment arose out of
23   measures taken after the search at issue and is therefore inadmissible pursuant to Rule 407
     of the Federal Rules of Evidence.  Yavapai County Defendants' Motion to Strike at 2.  Rule
24   407 makes inadmissible "evidence of . . . subsequent measures" which, "if taken previously,
     would have made the injury or harm less likely to occur."  The PANT Board's knowledge of
25   their specific training deficiencies would not make an injury less likely to occur, and
     therefore the statement is admissible.  See Rocky Mountain Helicopters, Inc. v. Bell
26   Helicopters Textron, 805 F.2d 907, 918 (10th Cir. 1986) ("It would strain the spirit of the
     remedial measure prohibition in Rule 407 to extend its shield to evidence contained in post-
27   event tests or reports.").  Accordingly, Yavapai County Defendants' objection is overruled.
28

of this evidence, and the lack of countervailing evidence with regard to Hodap's training and knowledge of the requisite waiting period, we cannot conclude that the need for more or different training was so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the PANT Board was deliberately indifferent to the need for additional training.

Plaintiffs also submit evidence to show that, although Hodap was aware of the requisite waiting period, he decided not to wait after knocking and announcing.  PSOF, Exhibit 8 at 137-38.  To the extent that this is true, it further protects Board Defendants from liability because supervisors cannot be held vicariously liable for the constitutional torts committed by their subordinates.  Therefore, with regard to these claims, we grant defendants' motions for summary judgment (docs. 62, 67, 68, 82) and deny plaintiffs' motion for summary judgment (doc. 64).

**E.  Official Capacity Claims Against all Defendants for the Failure to Train**

Plaintiffs also claim that all defendants are liable in their official capacities, by which plaintiffs claim that the municipalities for which each defendant works failed to properly train PANT defendants with regard to the execution of search warrants.  "Only where a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983."  City of Canton, 489 U.S. at 389, 109 S. Ct. at 1205.  As with regard to plaintiffs' claims against Board Defendants, there is insufficient evidence from which to conclude that the need for more or different training was so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the municipalities for which each defendant worked were deliberately indifferent to the need for training.  Therefore, with regard to these claims, we grant defendants' motions for summary judgment (docs. 62, 67, 68, 82) and deny plaintiffs' motion for summary judgment (doc. 64).

1

### VI.  Claim Three: Excessive Force

2   Plaintiffs claim that PANT Defendants violated plaintiffs' Fourth and Fourteenth

3   Amendment rights by using excessive force during their arrest and detention.  Complaint at

4   13.  Plaintiffs also raise the related claims against defendants for inadequate training.  Id.

5   Plaintiffs and defendants move for summary judgment on these claims (docs. 64, 67, 68, 82,

6   120).

7

### A.  Personal Capacity Claims Against PANT Defendants

8   A claim against law enforcement officers for excessive force is analyzed under the

9   Fourth Amendment's "objective reasonableness" standard.  Graham, 490 U.S. at 399, 109 S.

10  Ct. at 1873.  However, where "an officer intentionally or recklessly provokes a violent

11  response, and the provocation is an independent constitutional violation, that provocation

12  may render the officer's otherwise reasonable defensive use of force unreasonable as a matter

13  of law." Billington v. Smith, 292 F.3d 1177, 1190-91 (9th Cir. 2002) (emphasis in original).

14  Plaintiffs argue that PANT defendants applied an unreasonable amount of force, and at all

15  events, because the need for the use of force was proximately caused by the independent

16  constitutional violation with regard to the execution of the search warrant, any use of force

17  was unreasonable as a matter of law.

18  Plaintiffs, however, failed to submit evidence from which a jury could reasonably

19  conclude that PANT Defendants' conduct provoked the violent response.  It is undisputed

20  that PANT defendants knocked and announced their presence several times before breaching

21  the interior front door.  Plaintiffs argue that the announcements were incomprehensible from

22  inside the house, but we must judge the officer's actions "from the perspective of a reasonable

23  officer on the scene," Billington, 292 F.3d at 1190 (quoting Graham, 490 U.S. at 396, 109

24  S. Ct. at 1865), and there is no indication that the PANT Defendants knew, or had reason to

25  believe, that their announcements were incomprehensible.  We therefore conclude that

26  because PANT Defendants reasonably alerted the residents to their presence before

27

28

breaching the front door of the house, they did not provoke the violent response.[14] Therefore, PANT Defendants are not liable for the mere use of force, and are only liable for any unconstitutionally excessive use of force.

"Determining whether the force used to effect a particular seizure is reasonable under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." Graham, 490 U.S. at 396, 109 S. Ct. at 1871 (quotations omitted). This requires evaluating "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Id. (citation omitted). "Not every push or shove, even if it may later seem unnecessary in the peace of the judge's chambers, violates the Fourth Amendment." Id. at 396, 109 S. Ct. at 1872 (quotation omitted). "The calculus of reasonableness . . . embod[ies] allowance for the fact that police officers are often forced to make split-second judgments–in circumstances that are tense, uncertain, and rapidly evolving–about the amount of force that is necessary in a particular situation." Id. at 396-97, 109 S. Ct. at 1872.

Plaintiffs claim that defendants Hodap, Palguta, Johnson and Wylie used excessive force to arrest Robert Howell. Complaint at 13. Robert Howell testifies that after he realized that the intruders were the police, had dropped his weapon, laid on the ground, and did not resist arrest. PSOF, Exhibit 17 at 189-190. He further asserts that although he complied during his arrest, he was thrown on the ground with enough force to tear the rotator cuff in his right shoulder. PSSOF ¶¶ 84-86. Plaintiffs claim that defendants Bonney, Wilcoxson and Gronek used excessive force to arrest Patti Howell. Complaint at 13. Patti Howell testified that although she did not resist arrest, she was thrown on the ground, Bonney was

---

[14] In contrast, had the officers not knocked and announced their presence, or had they entered the interior front door at the moment that they knocked and announced their presence, we may have concluded that the surprise of the entrance provoked the violent response.

on her back, the officers were very rough with her and attempted to injure her,[15] the officers "dragged [her] a little bit and [her] foot hit the concrete," and she suffered bruises on her left arm and abrasions on top of her right foot.  PSSOF ¶¶ 87-90, Exhibit 50 at 53.

Viewing the facts in the light most favorable to the plaintiffs, we find that PANT Defendants did not use unconstitutionally excessive force.  PANT Defendants knew that they had been fired at, and they reacted quickly to control the situation.   Robert Howell surrendered, but he had already displayed violent activity, and PANT Defendants had no way of knowing whether he concealed additional weapons, or whether he would display additional violent activity.  The police had similar reason to restrain and frisk Patti Howell. The situation was certainly "tense, uncertain, and rapidly evolving," and it appears that the entire event took place in a matter of seconds.  The evidence shows that PANT Defendants roughly frisked and restrained plaintiffs, and that plaintiffs sustained injuries, but that does not make the use of force excessive.[16]  Accordingly, with regard to these claims, we grant defendants' motions for summary judgment (docs. 67, 68, 82, 120) and deny plaintiffs' motion for summary judgment (doc. 64).

### B.  Failure to Train Claims

Plaintiffs claim that all defendants are liable for the failure to train PANT Defendants with regard to the use of force.  Complaint at 13.  Because we conclude that PANT Defendants did not use excessive force,  plaintiffs cannot state an actionable claim for the failure to train with regard to the use of force.  Accordingly, with regard to these claims, we grant defendants' motion for summary judgment (docs. 67, 68, 82, 120) and deny plaintiffs' motion for summary judgment (doc. 64).

---

[15] We examine whether the officers' actions were " 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation."  Graham, 490 U.S. at 397, 109 S. Ct. at 1872 (citations omitted).

[16] Robert Howell states that police officers "stomped [Patti Howell] into the concrete" which caused her to scream in pain.  PSOF, Exhibit 48 at 207-08.  By this, he means that Bonney was on Patti Howell's back, not that the PANT Defendants trampled her underfoot. Id.

## VII. Claim Four: Unconstitutional Arrest

Plaintiffs claim that PANT Defendants violated Robert Howell's Fourth and Fourteenth Amendment rights by arresting him without probable cause. Id. at 14. Plaintiffs also raise the related claims against defendants for inadequate training. Id. Defendants move for summary judgment on these claims (docs. 62, 67, 68, 82).

### A. Personal Capacity Claims Against PANT Defendants

The parties confuse two discrete legal issues in their briefings: 1) whether the police had probable cause to arrest Robert Howell for the shooting; and 2) whether the allegedly unconstitutional search proximately caused Robert Howell's subsequent arrest and therefore provided plaintiff with an actionable section 1983 claim for unconstitutional arrest.

The police had probable cause to arrest plaintiff after he fired his gun at them. The allegedly unconstitutional search has no effect on this analysis, even if that search provoked Robert Howell to violence, because to immunize the defendant from an arrest linked in the chain of causation to an officer's illegality would give the "defendant an intolerable carte blanche to commit further criminal acts." United States v. Bailey, 691 F.2d 1009, 1017 (11th Cir. 1983).

However, although the police can arrest a suspect for a criminal act linked to his previous illegality, that does not immunize the police from subsequent civil liability arising out of the arrest. For example, in Alexander v. San Francisco, 29 F.3d 1355, 1358 (9th Cir. 1994), police forcibly entered Henry Quade's home, Quade attempted to shoot the police, and the police fired back. The Court of Appeals held that although the police may have reasonably fired after being fired upon, they may still be liable under section 1983 for excessive force if they unreasonably and therefore unconstitutionally entered Quade's house. Id. at 1366. The Court of Appeals later clarified this form of liability: where "an officer intentionally or recklessly provokes a violent response, and the provocation is an independent constitutional violation, that provocation may render the officer's otherwise reasonable defensive use of force unreasonable as a matter of law." Billington, 292 F.3d at 1190-91 (emphasis in original). "[I]f an officer's provocative actions are objectively unreasonable

1 under the Fourth Amendment, as in <u>Alexander</u>, liability is established, and the question

2 becomes the scope of liability, or what harms the constitutional violation proximately

3 caused." <u>Id</u>. at 1190.  However, we already concluded that PANT Defendants did not

4 provoke the shooting.  Accordingly, we grant defendants' motions for summary judgment on

5 these claims (docs. 62, 67, 68, 82).

6                          **B.  Failure to Train Claims**

7          Plaintiffs claim that all defendants are liable for the failure to train PANT Defendants

8 with regard to arrests.  <u>Complaint</u> at 14.  Because the arrest was constitutional, plaintiffs

9 cannot state an actionable claim for the failure to train with regard to arrests.  Accordingly,

10 we grant defendants' motions for summary judgment on these claims (docs. 62, 67, 68, 82,

11 120).

12                        **VIII.  Motions to Strike**

13          Plaintiffs and defendants submit numerous motions to strike, arguing that the briefings

14 violate the Federal Rules of Civil Procedure, the Local Rules of Civil Procedure, and the

15 Federal Rules of Evidence (docs. 89, 93, 100, 107, 123, 126, 128).  Plaintiffs and defendants

16 submitted supplemental statements of facts without leave of the court (docs. 90, 118, 121,

17 132).  Plaintiffs submitted a supplemental briefing without leave of the court (doc. 119).

18 Defendants submitted briefings with a font size smaller than that permitted by the Local

19 Rules of Civil Procedure (doc. 68).  Both plaintiffs and defendants violated our rules of

20 procedure.  Rather than strike all documents which violate the rules, we have considered all

21 documents except those where we previously alerted the parties to their deficiencies.  We

22 also considered all evidence not in violation of the Federal Rules of Evidence.  Accordingly,

23 all motions to strike are denied (docs. 89, 93, 100, 107, 123, 126, 128).

24                          **IX. Motion to Extend**

25          Prescott Defendants move for an extension of time until September 21, 2005 to

26 disclose an expert witness (doc. 77).  We deny defendants' motion as moot because Prescott

27 Defendants did not disclose an expert witness by that date (doc. 77).

28

## X.  Conclusions

**IT IS ORDERED DENYING** defendants' motions for summary judgment on Claim Two for judicial deception against defendant Palguta in his personal capacity (docs. 62, 67, 68, 82, 120); **DENYING** defendants' motions for summary judgment on Claim Two for the unconstitutional execution of the search warrant against PANT Defendants in their personal capacities (docs. 62, 67, 68, 82, 120); and **GRANTING** defendants' motions for summary judgment with regard to all other claims (docs. 62, 67, 68, 82, 120).

**IT IS FURTHER ORDERED DENYING** plaintiffs' motion for summary judgment with regard to all claims (doc. 64).

**IT IS FURTHER ORDERED GRANTING** summary judgment for defendants on plaintiffs' claims against defendant Hodap for the failure to supervise the other PANT Defendants.

**IT IS FURTHER ORDERED DISMISSING** Claim Five.

**IT IS FURTHER ORDERED DENYING** all motions to strike (docs. 89, 93, 100, 107, 123, 126, 128).

**IT IS FURTHER ORDERED DENYING** Prescott Defendants' motion for an extension (doc. 77).

For clarity, the following claims are still viable:  Claim Two against defendant Palguta in his personal capacity for judicial deception; and Claim Two against PANT Defendants in their personal capacities for the unconstitutional execution of the search warrant.

DATED this 24th day of February, 2006.


_Frederick J. Martone_
_____
Frederick J. Martone
United States District Judge